UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **United States of America** | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:20-MJ-266 |
| | ) |
| **Graciela Vasquez Martinez,** | ) |
| | ) |
| **Defendant.** | ) |

## BRIEF IN SUPPORT OF BOND

This is no ordinary request for bond because these are no ordinary times. Every bond decision involves the balancing of risks. The risk of flight; the risk of violence; the risk of nonappearance; the risk of holding an innocent person; and, the risk of holding even a "guilty" person too long or in conditions that are unsafe, unjust, or otherwise inappropriate. This decision ultimately is placed in the hands of experienced judges and not a matrix or computer because the risks are variable and the weighing a matter of judgment, not mathematical precision. Today, the fundamental calculus of such risks has changed because the nature of those risks has changed. The Coronavirus Disease 2019 (COVID-19) has exponentially increased the risk of holding a pretrial detainee—both the risks to the health and wellbeing of the detainee and her family, but also the risks to society of facilitating the spread of the disease.

Defendant Graciela Vasquez Martinez, by and through her attorney Lynsey M. Barron, files this Brief in Support of Bond. Accepting the allegations in the Criminal Complaint as true for purposes of bond, Ms. Vasquez is a low-level member of a drug distribution conspiracy. She did not engage in any drug transaction, but rather chauffeured her roommate from their home to an alleged stash house. She is a gainfully employed, tax-paying Lawful Permanent Resident with no history of violence or criminal conduct and poses no risk of nonappearance. Even in ordinary times, these facts would warrant a bond.

But, as noted above, these are not ordinary times. The pandemic that brought the entire world to its knees has reached the doors of the Robert A. Deyton Detention Facility ("RAD"), where Ms. Vasquez would be assigned. And as of the filing of this brief, at least 57 federal inmates and 37 staff have tested positive in Bureau of Prisons facilities alone, which does not account for pretrial detainees.[1] Given the speed with which the Coronavirus Disease 2019 (COVID-19) is ravaging the incarcerated, and the death of one inmate in federal custody already this week,[2] the risk to Ms. Vasquez is far too great to warrant detention on these facts. This Court should release her on bond.

---

[1] *See* https://www.bop.gov/coronavirus/index.jsp (last checked April 2, 2020 at 8:40 a.m.)
[2] *See* https://www.newsweek.com/first-federal-inmate-49-coronavirus-bureau-prisons-facility-louisiana-1494862

## BACKGROUND

1. **Alleged Offense Conduct**

The affidavit in support of the Criminal Complaint charges that the Drug Enforcement Agency (DEA) learned by intercepted wire communications that Ms. Vasquez, along with codefendant Marco Juarez Guevara, were to receive drugs as part of a large transaction on the morning of March 30, 2020. (Doc. 1 ¶ 17.) Surveilling the apartment where Ms. Vasquez and Mr. Juarez live together, a DEA agent saw Mr. Juarez place a bag into the back of a sports utility vehicle (SUV), and a grill and trash bag on top of the SUV. (*Id.* ¶ 19.) Ms. Vasquez then drove herself and Mr. Juarez to a trailer park where Mr. Juarez got out of the SUV and met codefendant Pablo Aguirre Lucas. (*Id.*) There is no allegation that Ms. Vasquez was a party to this conversation, or that she was even within earshot of what was said; nor did agents see any items pass between the defendants at that time. (*Id.*) Indeed, agents *never* saw any items pass between the defendants.

DEA agents followed the SUV driven by Ms. Vasquez to a house in Lilburn, Georgia that DEA believes to be a stash house used by Mr. Juarez. (*Id.* ¶ 20.) Ms. Vasquez and Mr. Juarez were observed carrying two boxes into the house, and Mr. Juarez later took in a suitcase. (*Id.*) Based on intercepted wire communications, DEA agents believed that another codefendant, Saul Aguilar Rico, was going to pick up Mr. Aguirre and bring him to that house. (*Id.* ¶ 21.) Ms. Vasquez was then

to pick up Mr. Juarez once Mr. Aguirre arrived "so that the drugs were not unattended." (*Id.*) Although the affidavit does not make the chronology clear on this point, presumably Ms. Vasquez had previously left Mr. Juarez at the house alone and would be returning to fetch him. (*Id.* ¶ 23.) Agents arrested Ms. Vasquez while she was en route to the house. (*Id.*)

DEA agents obtained warrants to search, among other premises, the apartment where Ms. Vasquez and Mr. Juarez lived, along with the stash house. (*Id.* ¶ 24.) At the stash house, they seized 57.9 gross kilograms of suspected cocaine, three firearms, and numerous cellular telephones. (*Id.* ¶ 25.) The affidavit does not allege that any of these items were found in the boxes Ms. Vasquez helped carry into the house. Indeed, the intercepted wire communications suggested that Ms. Vasquez and Mr. Juarez "were to *receive* the drugs" from Mr. Aguirre on the morning of March 30, 2020. (*Id.* ¶ 17 (emphasis added).) Yet agents never saw Ms. Vasquez and Mr. Juarez receive anything—he loaded items in and on an SUV, she drove him to a parking lot and then to a house, she helped carry in two boxes (neither of which were among the items Mr. Juarez loaded into the SUV that morning), she left, and was returning to fetch him around 2:30. (*Id.* ¶ 23.) What DEA expected to see, and what they actually saw, are vastly different.

The affidavit does not mention any items discovered or recovered during the search of Ms. Vasquez's home.

4

## 2. Characteristics of Ms. Vazquez

Ms. Vasquez is a 41-year old mother of three who lawfully emigrated to this country from the Dominican Republic in 1998. She has not returned to that country since. She has worked the entire time she has been in the United States, has consistently filed tax returns, and became a Lawful Permanent Resident in May 2019. She has never committed any crimes, and has never used drugs.

Regarding her current situation, she lives in an apartment in Gwinnett County where she is the sole caregiver for her three children, ages 17, 10, and 2; the father of the youngest child stays with them on weekends. Since her arrest, her eldest child is caring for the family with help from friends. She was employed by a house painting company until December 2019, and has been cleaning houses since. Ms. Vasquez understands the hardship the pandemic has created for job seekers, but would continue to seek housecleaning opportunities if released. She is needed at home by her children, and has a strong incentive to stay in this judicial district so she can care for them.

## 3. Coronavirus and Conditions at Robert A. Deyton Detention Facility

Ms. Vasquez respectfully asks that she not be ordered to wait out this pandemic in one of the most high-risk environments in the country—a prison. It has long been known that conditions of pretrial confinement create the ideal

environment for the transmission of contagious disease,[3] but the speed at which COVID-19 is spreading through prisons has been alarming.[4] Inmates cycle in and out of detention facilities from all over the world and the country, and people who work in the facilities leave and return daily without screening for infection. Incarcerated people have poorer health than the general population and medical care is limited.[5] Moreover, the levels of hygiene and social distancing required to combat this disease are simply not achievable in an incarcerated setting, making infection control a near Sisyphean task.

More acutely, COVID-19 has likely reached RAD, where Ms. Vasquez would be housed pending trial. As one Magistrate Judge in this judicial district learned earlier this week, a pretrial detainee housed at RAD tested positive for COVID-19.[6] Add to that fact (1) the Bureau of Prisons's decision to suspend transportation of inmates to their designated prisons,[7] meaning those inmates

---

[3] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.

[4] *See* Interim Guidance on Mgmt. of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Ctr. for Disease Control, at 2 (Mar. 23, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf (hereinafter "CDC Guidance"); *see also* "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[5] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf

[6] *See* Order Granting Release Pending Final Hearing on Petition for Revocation of Supervised Release, *United States v. Bolston*, 1:18-cr-382-MLB-RDC, Doc. 20 n.3 (Mar. 30, 2020).

[7] *Id.*

remain in pretrial detention longer than normal, and (2) the influx of more new pretrial detainees every day who have been in the community as COVID-19 spreads, and the risk of exposure in an increasingly overcrowded environment will grow exponentially.

The United States, through the Centers for Disease Control and Prevention ("CDC"), expressly urges that the government "[e]xplore strategies to prevent over-crowding of correctional and detention facilities during a community outbreak."[8] Granting bond to a non-violent offender is just such a strategy.

## ARGUMENT

Because she is charged with violations of the Controlled Substances Act that carry a maximum sentence of 10 years or more, Ms. Vasquez acknowledges that the Bail Reform Act invokes a rebuttable presumption that there are no conditions of release that could ensure the safety of the community or her presence at required court appearances. *See* 18 U.S.C. § 3142(e)(2)(3)(A) and (f)(1)(C). Ms. Vasquez's personal characteristics, ties to the community, and lack of criminal history should allay any concerns this Court has about whether she would do well on a bond.

Indeed, *most* defendants on pretrial release in the federal system appear in court and do not reoffend. In 2019, 99% of released federal defendants appeared

---

[8] *See* CDC Guidance, *supra* n. 4

for court, and over 98% did not commit new offenses while on bond.[9] This near-perfect compliance rate is seen equally in federal districts with very high release rates (~70%) and those with very low release rates (~24%).[10]

Notwithstanding the rebuttable presumption, the Bail Reform Act authorizes this Court to release Ms. Vasquez if it "determines such release to be necessary for preparation of the person's defense *or for another compelling reason*." 18 U.S.C. § 3142(i) (emphasis added). The health risk COVID-19 poses to the incarcerated is a compelling reason even in a presumption case to release her with conditions rather than to continue detention. Such solution allows this Court to balance the "total harm and benefits to prisoner and society" that continued pretrial imprisonment of Ms. Vasquez will yield, relative to the heightened health risks posed to her during this rapidly encroaching pandemic. *See Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling

---

[9] *See* AO Table H-15, http://jnet.ao.dcn/sites/default/files/pdf/H15_Ending12312019.pdf (showing a nationwide failure to appear rate of 1.1% and a rearrest rate of 1.8% in 2019).
[10] The six federal districts with the lowest release rates (average 24.37%) have an average failure to appear rate of 1.78%, while the six districts with the highest release rates (average 69.08%) have an even lower failure to appear rate of 0.42%. *See* AO Table H-15; Table H-14A, https://www.uscourts.gov/sites/default/files/data_tables/jb_h14a_0930.2019.pdf. The six districts with the lowest release rates have an average re-arrest rate of 1.10%, while the six districts with the highest release rates have an average re-arrest rate of 0.91%. *See* Table H-15. (The districts with the lowest release rates are D. Utah, E.D. Oklahoma, W.D. Arkansas, S.D. Texas, E.D. Tennessee, and S.D. California; the districts with the highest release rates are D. Guam, D. Northern Mariana Islands, W.D. Washington, D. Connecticut, D. Maine, and D. Hawaii. *See* Table H-14A.)

for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant).

Where, as here, there has been a suspected or confirmed case of COVID-19, the CDC urges to suspend the introduction of new detainees into the facility:

> Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding.[11]

Ironically, then, granting Ms. Vasquez a bond is the absolute ***best*** way to ensure her safety and the safety of the community in light of the pandemic.

## Conclusion

Despite this being a presumption case, there are conditions of release this Court could impose that will ensure Ms. Vasquez's appearance and mitigate any threat she may pose to the community. Given the factors that make her a good candidate for bond and the extraordinary danger she faces if detained, Ms. Vasquez urges this Court to release her pending resolution of this case.

---

[11] *See* CDC Guidance, *supra* n. 4.

Respectfully submitted,

**MILLER & MARTIN PLLC**

By: /s/ Lynsey M. Barron
    Lynsey M. Barron,
    Georgia Bar No. 661005

    1170 Peachtree Street, N.E. Suite 800
    Atlanta, Georgia 30309-7706
    Tel: (404)962-6100
    Fax: (404)962-6300
    E: lynsey.barron@millermartin.com
    Attorney for Graciela Vasquez
       Martinez

## CERTIFICATE OF SERVICE

    I hereby certify that on the below date I electronically filed the foregoing Brief in Support of Bond with the Clerk of Court using CM/ECF system which will automatically send email notification of such filing to the to the following attorneys of record:

>Tyler Mann
>Assistant United States Attorney
>600 U.S. Courthouse
>75 Ted Turner Drive SE
>Atlanta, GA 30303

This 2nd day of April, 2020

>/s/ Lynsey M. Barron
>By:  Lynsey M. Barron
>    Attorney for Graciela Vasquez Martinez